Jan BRANDIN, Plaintiff,

v.

Darwin DEASON, Jeffrey A. Rich, Mark A. King, Joseph O'Neill, Frank Rossi, Lynn R. Blodgett, David W. Black, Henry Hortenstine, Peter A. Bracken, William L. Deckelman, Jr., Warren Edwards, John M. Brophy, John Rexford, Dennis McCuistion, J. Livingston Kosberg and Clifford M. Kendall, Defendants,

and

Affiliated Computer Services, Inc., Nominal Defendant.

C.A. No. 2123–VCL.

Court of Chancery of Delaware, New Castle County.

Submitted: July 17, 2007.
Decided: July 20, 2007.

Norman M. Monhait, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Edward F. Haber, Esquire, Michelle H. Blauner, Esquire, Matthew L. Tuccillo, Esquire, Shapiro, Haber & Urmy, LLP, Boston, Massachusetts, Attorneys for Plaintiff.

Allen M. Terrell, Esquire, Harry Tashjian, IV, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; William B. Dawson, Esquire, Karen L. Hirschman, Esquire, Matthew R. Stammel, Esquire, Vinson & Elkins, L.L.P., Dallas, Texas; Aitan Goelman, Esquire, Zuckerman Spaeder, L.L.P., Washington, D.C.; Karen Patton Seymour, Esquire, Sullivan & Cromwell, L.L.P., New York, New York; Gary P. Naftalis, Esquire, Kramer, Levin, Naftalis & Frankel, L.L.P., New York, New York, Attorneys for Defendants Jeffrey A. Rich, Mark A. King and Warren Edwards.

David C. McBride, Esquire, Bruce L. Silverstein, Esquire, Martin S. Lessner, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Defendants Darwin Deason, David Black, Lynn Blodgett, John Brophy, William Deckelman, Henry Hortenstine, Clifford Kendall, John Rexford, and Peter Bracken.

Kenneth J. Nachbar, Esquire, Susan Wood Waesco, Esquire, Morris Nichols Arsht & Tunnell, LLP, Wilmington, Delaware; Attorneys for Defendants Joseph O'Neill, Frank Rossi, Dennis McCuistion, and J. Livingston Kosberg.

Edward P. Welch, Esquire, Edward B. Micheletti, Esquire, Nicole DiSalvo, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware, Attorneys for Nominal Defendant Affiliated Computer Services, Inc.

## OPINION

LAMB, Vice Chancellor.

Over a year after the filing of this derivative action and several months after the sixteen individual defendants answered the amended complaint, three of them now ask the court to stay this case, which challenges purported stock option backdating practices allegedly perpetrated by various directors and officers of a Delaware corporation, pending resolution of a later-filed parallel proceeding in a Texas federal court. Largely because substantial unsettled issues of Delaware law are involved in this litigation, and since the defendants' claims that they would be inconvenienced by proceeding in this forum are both dilatory and pretextual, the court will deny their request to stay this case.

### I.

#### A. *The Parties*

The plaintiff, Jan Brandin, is a Massachusetts resident who alleges that he has owned stock in the nominal defendant, Affiliated Computer Services, Inc., since July 19, 2001. Affiliated is a Delaware corporation with a principal place of business in Dallas, Texas. The company provides information technology and business process outsourcing services.

Defendant Jeffrey A. Rich is a former chief executive officer and director of Affiliated, having resigned from those positions in September 2005. Defendant Mark A. King is a former president, chief executive officer, and director of the company. King stepped down from his posts in November

2006. Joining him that month was defendant Warren Edwards, who, until that time, served as Affiliated's chief financial officer.[1] Thirteen other persons, all of whom either served or continue to serve as Affiliated's officers and directors, are individual defendants in this case, but do not join in the present motion.[2]

## B. *The Facts*

Brandin filed this derivative action on May 2, 2006, and subsequently amended his complaint on August 15, 2006. He alleges that between 1994 and 2002, the individual defendants breached their fiduciary duties to Affiliated by engaging in a scheme to backdate stock options in violation of the company's stock option plans. In the weeks following Brandin's initial filing, other derivative plaintiffs brought lawsuits in courts around the country alleging similar claims based on virtually identical facts. Of particular importance here is a consolidated derivative action originally filed on June 22, 2006 in the U.S. District Court for the Northern District of Texas (the "Texas Action").[3] In addition to the same state law causes of action Brandin sets forth here, the complaint in the Texas Action includes a number of additional derivative claims based on purported violations of the Securities Exchange Act of 1934 and the rules promulgated thereunder.[4] The Texas Action has remained virtually dormant since its commencement over a year ago, although the defendants there filed motions to dismiss in early June 2007, arguing, *inter alia,* that the Texas plaintiffs failed to adequately allege demand futility.[5] No defendant has filed an answer in the Texas Action, and discovery is at a standstill due to the automatic stay provisions of the Private Securities Litigation Reform Act.[6]

By comparison, the Delaware action has proceeded at a relatively steady pace. All of the individual defendants have answered the amended complaint, and, although they raise vaguely phrased affirmative defenses premised on Court of Chancery Rule 23.1, none of the defendants moved for dismissal on demand-related grounds. Brandin has served several sets of interrogatories and document requests on the defendants, and has obtained over a million pages of document discovery from Affiliated. On April 5, 2007, Brandin moved for partial summary judgment against Deason, Rich,

1. In a press release dated November 26, 2006, Affiliated reported on its internal investigation of the company's options dating practices, which concluded that, among other things, "in a significant number of cases Mr. Rich, Mr. King and/or Mr. Edwards used hindsight to select favorable grant dates during the limited time periods after Mr. Deason had given the officers his authorization to proceed to prepare the paperwork for the option grants and before formal grant documentation was submitted to the applicable compensation committee." *See* Affidavit of Norman M. Monhait, Ex. 1.

2. Those individuals are: Darwin Deason, Joseph O'Neill, Frank Rossi, Lynn R. Blodgett, David W. Black, Henry Hortenstine, Peter A. Bracken, William L. Deckelman, Jr., John M. Brophy, John Rexford, Dennis McCuistion, J. Livingston Kosberg, and Clifford M. Kendall.

3. The Texas Action comprises two derivative cases: *Alaska Electrical Fund v. Rich, et al.,* Cause No. 3:06–cv–1110–M (N.D. Tex. filed June 22, 2006) and *Lunceford v. Rich, et al.,* Cause No. 3:06–cv–1212–M (N.D.Tex. July 7, 2006).

4. 15 U.S.C. § 78a *et seq.* The Exchange Act claims are based on section 10(b) and rule 10b–5, section 14(b), section 20(a), and section 16(b).

5. The consolidated complaint was filed on October 11, 2006. Following a failed mediation on March 6, 2007, the plaintiffs in the Texas Action amended their complaint on April 6, 2007.

6. 15 U.S.C. § 78u–4(b)(3)(B).

and King on the grounds that those defendants received backdated stock option grants and, accordingly, the company is entitled to rescind the grants and receive any monetary benefits wrongfully obtained therefrom.[7] On May 11, 2007, Rich, King, and Edwards moved to stay this action in favor of the Texas Action.

## II.

In support of their motion, the defendants argue that allowing this case to proceed would result in duplicative and wasteful litigation. Brandin's complaint, the defendants contend, is merely a subset of the claims asserted in the Texas Action because a number of federal securities laws issues, over which this court has no jurisdiction, are alleged there. The defendants also posit that Brandin has no standing to contest the validity of stock options granted on eleven of the twelve dates in question since he did not own Affiliated stock at those times. Thus, the defendants say, this lawsuit, unlike the Texas Action, will not resolve the substantive merits of state law claims implicating a majority of the alleged misconduct perpetrated by Affiliated's management. Finally, the defendants, as Texas residents, argue they will be saddled with great hardship by having to litigate this case in Delaware, and are presented with "a real threat" that certain key witnesses would be unable to present live testimony at trial.

Brandin views the present motion as a belated and frivolous attempt by a handful of defendants to further delay substantive judicial scrutiny of their past conduct. In opposition to the motion, he argues that Delaware, as Affiliated's state of incorporation, has an overriding interest in hearing this case because it involves a type of fiduciary malfeasance—stock options backdating—which has the potential to raise unsettled, yet important, issues of Delaware corporate law. Moreover, Brandin says this case was filed before the Texas Action, and, in stark contrast to that lawsuit, has progressed substantially. The defendants' litany of hardships, according to Brandin, is pretextual: had they truly faced insurmountable difficulty by proceeding in Delaware, such issues would have surfaced many months ago, before answers to the complaint were filed and before Brandin ever moved for partial summary judgment. In essence, Brandin asks the court not to countenance the kind of litigation gamesmanship that, he believes, is all too clear if one looks beneath the surface of this motion.

## III.

■ Pursuant to the teachings of *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co.*, principles of comity allow a Delaware court great discretion to stay a case "when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues."[8] The *McWane* doctrine, however, has limited application to the present motion because this case was filed well before the Texas Action and because, as this court has consistently recognized, the doctrine's application "presents great difficulty in shareholder derivative actions."[9]

■ Indeed, when deciding a motion to stay in the context of a representative lawsuit, the "paramount interest" the court must protect is ensuring that a corporation's stockholders receive "fair and consis-

---

7. The court subsequently entered an order establishing a briefing schedule on Brandin's motion and set oral argument for October 19, 2007.

8. 263 A.2d 281, 283 (Del.1970).

9. *Ryan v. Gifford,* 918 A.2d 341, 349 (Del.Ch. 2007).

tent enforcement of their rights under the law governing the corporation...."[10] Thus, when faced with the question of whether to defer to another derivative suit, a court should "examin[e] more closely the relevant factors bearing on where the case should best proceed, using something akin to a *forum non conveniens* analysis."[11]

■ The *forum non conveniens* inquiry the court must apply in this case rests on six factors: "(1) the applicability of Delaware law in the action; (2) the relative ease of access to proof; (3) the availability of compulsory process for witnesses; (4) the pendency or non-pendency of any similar actions in other jurisdictions; (5) the possibility of a need to view the premises; and (6) all other practical considerations which serve to make trial easy, expeditious and inexpensive."[12] On the present facts, the defendants fail to carry their burden of persuasion to show that a stay is appropriate.[13]

■ First, Delaware law controls the entirety of Brandin's lawsuit, as well as the state law claims asserted in the Texas Action. Despite the defendants' arguments to the contrary, the law governing all of the intricacies potentially associated with stock options backdating claims is far from well-settled,[14] and Delaware courts have a sizable interest in resolving such novel issues to promote uniformity and clarity in the law that governs a great number of corporations.[15]

■ The present posture of this case and the Texas Action potentially raises novel issues of Delaware law. As an example, the procedural posture of this case may require the court to consider whether the defendants' decision to answer the amended complaint in this action and to begin discovery amounted to a waiver of their right to argue that demand on the board of directors was not excused.[16] Delaware precedent relevant to this issue

10. *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 953 (Del.Ch.2007).

11. *Ryan*, 918 A.2d at 349 (citing *Biondi v. Scrushy*, 820 A.2d 1148, 1159 (Del.Ch.2003)).

12. *In re Chambers Dev. Co., Inc. S'holders Litig.*, 1993 WL 179335, at *2 (Del.Ch. May 20, 1993). Obviously, the fifth factor has no bearing here.

13. Some debate exists as to whether, if a motion seeks to stay litigation rather than dismiss it pursuant to *forum non conveniens*, a defendant still must show "overwhelming hardship and inconvenience" to succeed on the motion, rather than simply illustrate that the relevant factors preponderate in his favor. *Compare HFTP Invs., LLC v. ARIAD Pharms., Inc.*, 752 A.2d 115, 121 (Del.Ch.1999) (applying the preponderance test on a motion to stay in the context of a direct action) *with Ryan*, 918 A.2d at 351 (applying the "overwhelming hardship" test to a motion to stay in the context of a derivative lawsuit). Regardless of which standard the court applies here, however, the defendants fall well short of their mark.

14. The defendants' argument that all the legal nuances associated with options backdating are crystalline is a bit sophomoric, considering that only three Delaware cases have dealt substantially with the issue to date. *See, e.g., Desimone v. Barrows*, 924 A.2d 908 (Del.Ch. 2007); *In re Tyson Foods, Inc.*, 919 A.2d 563 (Del.Ch.2007); *Ryan*, note 9 *supra.*

15. *See, e.g., Topps*, 924 A.2d 951, 954–56 (discussing the *Ryan* court's articulation of Delaware's policy interest in having its courts address important "emerging issues" in its corporate law).

16. The case law is clear that the demand requirement exists at the threshold of derivative litigation and that, when confronted with a derivative action, a board of directors cannot stand neutral, but "must affirmatively object to or support the continuation of the [derivative] litigation." *Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del.1990) (citing *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 731 (Del.1988)). *See also Aronson v. Lewis*, 473 A.2d 805, 811–12 (Del.1984). The fact that Delaware law requires a stockholder to make an election between arguing wrongful

seems to suggest that, by engaging in the discovery process, the defendants may have relinquished this right.[17] A second issue of unsettled Delaware law raised by the moving defendants' arguments concerns the proper application of principles of standing where the very nature of the wrongdoing alleged was affirmatively concealed by the corporation's misleading public disclosures over a long period of time. Where, as is alleged here, the plaintiff purchased shares before some of the allegedly backdated options grants and long before any suggestion of backdating emerged relating to earlier grants, does Delaware law prohibit the litigation of all related claims in an action brought by such a plaintiff? Given the large number of option backdating cases pending around the country, and the likelihood that many, if not most, of them raise similar issues, it is important for the Delaware courts to decide this, and all related issues, authoritatively.[18] The presence of complicated issues of unsettled Delaware law, then, strongly favors denial of the motion.

The second and third factors—relative ease of access to proof and availability of compulsory process for witnesses—deserve relatively little weight in the court's analysis on these facts. Although the defendants have identified three groups of witnesses whom they say are not subject to the court's subpoena power,[19] this argument lacks persuasive merit: the court can allow the deposition testimony of these individuals, should they refuse to appear at

demand refusal or demand futility in order to maintain a derivative suit seems to suggest, at least from a standpoint of equity and fairness, that a corporation's board should have to make a decision early in the litigation, instead of waiting until months of discovery are complete to raise demand-related issues. In the past, the Delaware Supreme Court has held that equivocal actions by directors can amount to a concession of interestedness or non-independence. *See generally Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368 (Del.Ch.1983).

17. The court also notes the possible import that a relatively new, yet substantial, body of federal case law has for issues that could be raised in this case and the Texas Action. Several federal courts have held that once a derivative plaintiff has suffered dismissal of his complaint for failure to adequately allege demand futility, the doctrine of collateral estoppel bars all subsequent plaintiffs from relitigating demand futility. *See West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 643 & n. 22 (Del.Ch.2006) (citing cases holding such, including *Henik ex rel. LaBranche & Co., Inc. v. LaBranche*, 433 F.Supp.2d 372 (S.D.N.Y.2006) and *In re Sonus Networks, Inc. S'holder Deriv. Litig.*, 422 F.Supp.2d 281 (D.Mass.2006)). If this court ultimately concludes that the director-defendants have, by their conduct, conceded the futility of demand in this case, the federal court in the Texas Action might well rely upon a similar theory to deny the defendants' demand-based arguments for dismissal in that litigation.

18. Although the *Ryan* and *Desimone* opinions both addressed the applicability of the continuing wrong exception, those opinions have not definitively answered all issues relating to standing in this context. Furthermore, discussion of the standing issue in *Desimone* appears to be dicta, as it was not necessary for that court to touch upon the continuing wrong exception in dismissing the plaintiff's claims in that case. *See generally Desimone* (refusing to apply the continuing wrong exception to allow a derivative plaintiff to pursue claims based on options backdating which predated his stock ownership, but nevertheless holding that the failure of the plaintiff's demand futility arguments merited dismissal). In this connection, it bears mentioning that the options granted on July 23, 2002 constitute 40% of the total number of options challenged in this case, and the defendants do not dispute Brandin's stock ownership as of that date.

19. The defendants point to lawyers at the national firm of Baker Botts, individuals at the accounting firm of PricewaterhouseCoopers, and former employees of Affiliated as persons who do not reside in Delaware and cannot be subpoenaed to testify.

trial in Delaware, to be admitted into evidence,[20] and stands ready to grant commissions to take those depositions should it prove necessary.[21] As to the ease of access to proof, the law firms representing the defendants are well staffed and are fully capable of culling through potentially relevant documents regardless of the exact geographic location where this occurs. More importantly, however, one would expect practical issues such as these, if truly constituting as heavy a burden on them as the defendants now contend, to have been raised months ago when this litigation began, rather than after the defendants answered Brandin's complaint and voluntarily engaged in discovery.[22]

In their briefing and at oral argument, the defendants seemed to recognize that the fourth and sixth *forum non conveniens* factors, dealing with the pendency of similar actions and other practical reasons why a stay might be merited, provide the strongest bases for their motion. All else being equal, Delaware courts prefer to avoid adjudicating a mere subset of the claims being actively litigated in another

jurisdiction.[23] Under close scrutiny, however, their arguments that the Texas Action should proceed in lieu of this one because it rests on a more comprehensive complaint ring hollow.

While Brandin admits that he did not acquire his Affiliated stock until July 19, 2001, this does not necessarily mean he lacks standing to contest option grants that occurred before that date. It is premature to judge what effect the continuous ownership requirement may have on Brandin's derivative standing, but that issue will very likely be determined in connection with the pending motions for partial summary judgment. More notably, however, there is no particular reason to assume that the named Texas plaintiffs have owned Affiliated stock any longer than Brandin. Instead, the defendants use carefully hedged statements in an attempt to convince the court that, due to the vague allegations of the plaintiffs' stock ownership in the Texas complaint, the Texas Action is likely to resolve a larger subset of the state law fiduciary claims than this case ever would.[24] Of course, if the

20. Court of Chancery Rule 32(a).

21. 10 *Del. C.* § 368. The court may also receive live testimony via videoconference from remote locations.

22. The court's suspicion of the defendants' position that litigating in Delaware would create a hardship, of course, is supported by the fact that the plaintiffs and the defendants in Texas agreed, for the better part of a year, to simply do nothing substantive to resolve that case through the judicial process. Indeed, at a hearing on June 22, 2007, Judge Barbara Lynn made light of the procrastination and inaction which, until just recently, have permeated the Texas Action. *See* Third Transmittal Affidavit of Harry Tashjian, Ex. C at 3 ("When this motion [for expedition] was filed the first thing I did was look at the case number, and said to myself what have I been doing with this case all this time. So I went back and studied the docket sheet, and I could call out the history of this, but I think it

is fair to say that this case has been sitting still for roughly a year because that's the way you all agreed to it. It has nothing to do with me. I got motion after motion after motion for extensions, and my general practice is when I get agreed motions, with exceptions, I grant them.... I still remain mystified by the timing of the final extension, which was May 18. So on May 18 there was an agreed motion for extension to file an answer, and to enter a scheduling order ... and I granted that on May 22. Three days later ... I received this motion to expedite, which I find confusing.").

23. *Kaufman v. Kumar*, 2007 WL 1765617, at *2 (Del.Ch. June 8, 2007) (citing *Corwin v. Silverman*, 1999 WL 499456, at *4 (Del.Ch. June 30, 1999)).

24. *See, e.g.,* Defs.' Opening Br. 7 (stating that the plaintiffs in Texas "seem to have standing" to challenge all of the stock option grants); Defs.' Reply Br. 7 (stating that "at

Texas plaintiffs were as specific in their pleadings with respect to stock ownership as Brandin, the plaintiff's potential lack of standing here might weigh in favor of a stay, depending on what those more specific pleadings revealed. But, on this record, the court is far from satisfied that the Texas Action provides any greater opportunity than this case does for a court to provide unitary resolution of the state law fiduciary claims levied against the defendants.

Nor does the court believe that it is necessarily sound practice for the Court of Chancery to stay a prior-filed derivative action in blind deference to a later-filed derivative action in a federal court in which the federal securities laws claims (over which the federal court has exclusive jurisdiction) are predicated on the same fiduciary misconduct that animates the state law claims. Although federal courts are quite capable of deciding cases involving Delaware corporate law,[25] the stockholders of companies incorporated in this state would suffer a disservice if Delaware courts suddenly became a forum of last resort, available for only that small percentage of representative suits which do

not, at least in theory, overlap with issues of the federal securities laws. Notably, in *Santa Fe Industries, Inc. v. Green,* the U.S. Supreme Court frowned upon a private litigant's attempt to broaden the sweep of section 10(b) of the Exchange Act and Rule 10b–5 thereunder to remedy fiduciary-based wrongs, as doing so would tend to bring within the federal regulatory framework "a wide variety of corporate conduct traditionally left to state regulation."[26] As Justice White observed, federal courts should proceed carefully when faced with litigation which largely encroaches upon state law fiduciary principles, since the unavoidable tendency would be for those courts "to depart from state fiduciary standards at least to the extent necessary to ensure uniformity within the federal system."[27]

## IV.

For the foregoing reasons, the defendants' motion to stay this proceeding in favor the later-filed Texas Action is DENIED. IT IS SO ORDERED.

---

least on the face of the pleading" in the Texas Action, those plaintiffs owned stock in Affiliated at the time each stock option was granted). The complaint in the Texas Action, in boilerplate fashion, alleges that the plaintiffs there held Affiliated stock "at all relevant times."

**25.** *See, e.g., Corwin,* 1999 WL 499456, at *4 & n. 13 ("Federal courts have proven time and

again their ability to apply and even extend Delaware law in appropriate ways.").

**26.** 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

**27.** *Id.*